**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| IRON BOW TECHNOLOGIES, LLC, | ) | |
| Plaintiff, | ) | No. 25-436 |
| v. | ) | Filed: July 29, 2026 |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Plaintiff Iron Bow Technologies, LLC ("Iron Bow") seeks to recover damages allegedly resulting from the Department of the Army's ("Army" or "the Agency") decision not to exercise the third and fourth option years of an information technology ("IT") software contract Iron Bow held with the Agency. Iron Bow asserts that this decision violated the contract's terms, specifically alleging that the Army: (1) breached its contractual obligation to exercise all option years subject only to its receipt of appropriations; (2) breached the contract's non-substitution clause by acquiring replacement products during the unexercised option periods; (3) materially misrepresented its intent to exercise all option years and its expectation that the IT products that were the subject of the contract would remain essential for the full term of the contract; and (4) breached the implied duty of good faith and fair dealing by destroying Iron Bow's reasonable expectations. The Government argues that it did not violate the contract and that Iron Bow's interpretation of the contract would violate the Anti-Deficiency Act ("ADA"), the Federal Acquisition Regulation ("FAR"), and the Competition in Contracting Act ("CICA").

Before the Court is the Government's Motion to Dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC").

For the reasons stated below, the Court **GRANTS IN PART** the motion as to Counts I and III, and **DENIES IN PART** the motion as to Counts II and IV.

## I. BACKGROUND

### A. Formation and Terms of the Delivery Order

On August 31, 2020, the Army issued Iron Bow indefinite-delivery indefinite-quantity ("IDIQ") Contract No. W52P1J-20-D-0058[1] as part of the Information Technology Enterprise Solutions-Software 2 initiative in support of the Computer Hardware Software and Solutions program. Pl.'s First Am. Compl. ¶ 16, ECF No. 8. Under that IDIQ contract, the Army awarded Delivery Order No. W91RUS-21-F-0073 ("Delivery Order") to Iron Bow on May 26, 2021. *Id.* ¶ 22. Through the Delivery Order, Iron Bow supplied the Army's Network Enterprise Technology Command ("NETCOM") with "certain Quest / NETPRO Enterprise Licenses," consisting of "software products that provide infrastructure optimization solutions and manage complex network infrastructures . . . in support of the Army's enterprise network directory services" (collectively "the Products"). *Id.* ¶ 25. Quest and NETPRO were the original manufacturers of the Products. *See id.*; Ex. 1 to Pl.'s First Am. Compl. at 30, ECF No. 8-1.

Many of the Products supported the modernization of NETCOM's Active Directory ("AD") environment. ECF No. 8 ¶¶ 25–26. AD refers to a "set of processes and services for various directory-based identity-related services" supporting Windows-domain networks. ECF No. 8-1 at 2 n.1. "The database (or directory) contains critical information about the network environment, including the identity and permissions of users and computers." *Id.* System administrators use AD for "controlling the authentication and authorization of users and related

[1] While Iron Bow's First Amended Complaint refers to the IDIQ as Contract No. W52PIJ-20-D-0058, *see* Pl.'s First Am. Compl. ¶ 16, ECF No. 8, the Delivery Order refers to the IDIQ as Contract No. W52P1J-20-D-0058, *see* Ex. 1 to Pl.'s First Am. Compl. at 15, ECF No. 8-1. The Court assumes this distinction in Iron Bow's pleading reflects a typographical error.

permissions for accessing and modifying the network." *Id.* The specific software Products provided by Iron Bow included "Change Auditor, Recovery Manager (Forest Edition), ActiveRoles, Enterprise Reporter, Active Admin, Safeguard Virtual Session, Safeguard Privilege Security Bundle, and Quest Migration Manager." *Id.* at 30.

The Products perform four functions in particular: (1) AD management and migration, (2) AD security, (3) threat mitigation, and (4) recovery management. ECF No. 8 ¶ 28. Tying these functionalities to the specific Products provided, Iron Bow explains that "Quest Active Roles provides user and group account management, . . . role-based security, and identity administration." *Id.* ¶ 68. "Change Auditor and Recovery Manager . . . identify which users or administrators made changes to AD objects, restore deleted objects, and monitor and secure ADs against exploits." *Id.* ¶ 69. "SafeGuard enables device discovery, compliance evaluation, continuous monitoring, and access control by managing user privileges and sign-ins." *Id.* ¶ 70. Finally, "Quest InTrust manages and maintains log information of all user workstation and administrator activity, including both system log-ons and logoffs," which "enables agencies to respond to threats by deploying automated responses to suspicious activity." *Id.* ¶ 71.

The Delivery Order included an initial 11-month base period of performance beginning on June 1, 2021, and four subsequent year-long option periods. *Id.* ¶¶ 22, 30. The Delivery Order incorporated the Terms and Conditions ("payment terms") of Iron Bow's proposal, stating "Proposal # NETCOM05142021, dated May 14, 2021, including the Terms and Conditions outlined in Attachment 1 thereto, is hereby, in its entirety made part of, incorporated by reference and included into the Delivery Order pagination." ECF No. 8-1 at 17. Iron Bow's proposal included several terms relevant to the parties' dispute:

> 2. Regarding FAR 52.232-19, *Availability of Funds*, Government will pay for the use of the products and/or services described in this contract (collectively, the

> "Products") in the annual option year installment payments set forth herein (the "Installment Payments"), during the base period and multiple option periods (the "Term"), subject to the Anti-Deficiency Act, 31 USC § 1341. Government intends to exercise all options and remit amounts owing in each option period in accordance with the Prompt Payment Act (FAR 52.232-25) subject only to its receipt of appropriations from Congress. Government will use best efforts to obtain appropriations and will allocate the same to make Installment Payments (which amounts are set forth on the Installment Payment Table above). There is no discount for early payment and no credit card payments are accepted. . . .
>
> 4. Government may extend or terminate this contract in whole but not in part. In the event of any termination or expiration of this contract prior to the end of the Term, Government will not during the Term replace the Products with or use products or devices having functions that the Products perform.
>
> 5. Government affirms that the Products will be essential to Government for the full Term.
>
> 6. If any of these payment terms conflict[] with any other provision of this contract or any other document, the FAR terms prevail. These terms will apply to all extensions of this contract.

*Id.* at 29 (italicization in original).

The Delivery Order also incorporated FAR 52.217-9, Option to Extend the Term of the Contract (Mar. 2000), in full text:

> (a) The Government may extend the term of this contract by written notice to the Contractor within 1 Day provided that the Government gives the Contractor a preliminary written notice of its intent to extend at least 30 Days before the contract expires. The preliminary notice does not commit the Government to an extension.
>
> (b) If the Government exercises this option, the extended contract shall be considered to include this option clause.
>
> (c) The total duration of this contract, including the exercise of any options under this clause, shall not exceed 5 years[.]
>
> (End of clause)

ECF No. 8-1 at 22 (red text and emphasis in original). Finally, the Delivery Order incorporated FAR 52.232-19, Availability of Funds for the Next Fiscal Year (Apr. 1984), in full text:

> Funds are not presently available for performance under this contract beyond 02 May 2022. The Government's obligation for performance of this contract beyond that date is contingent upon the availability of appropriated funds from which payment for contract purposes can be made. No legal liability on the part of the Government for any payment may arise for performance under this contract beyond 02 May 2022, until funds are made available to the Contracting Officer for performance and until the Contractor receives notice of availability, to be confirmed in writing by the Contracting Officer.
>
> (End of clause)

*Id.* (red text in original).

As an IT software reseller, Iron Bow obtained discounts on the Products from the original manufacturers. ECF No. 8 ¶ 1. Iron Bow then passed on these discounts to the Agency. *Id.* Under the Delivery Order, the base period and option periods were each priced at $12,484,900. *Id.* ¶ 22.

### B. Performance and Expiration of the Delivery Order

Contract performance commenced on June 1, 2021. *Id.* ¶ 30. The Army exercised the first option year on April 12, 2022, extending performance until May 2, 2023. *Id.* ¶¶ 31–32. On April 4, 2023, the Army exercised the second option year, further extending performance until May 2, 2024. *Id.* ¶ 33. On July 25, 2023, the contracting officer informed Iron Bow of the Agency's decision not to exercise the third option year and noted that the Delivery Order would expire at the end of the second option year on May 2, 2024. *Id.* ¶ 34.

In August 2023, the Army corresponded directly with an original manufacturer of the Products, Quest, about the Army's use of AD products and the pricing available to the Army. *Id.* ¶¶ 35–43. On August 7, 2023, Army Enterprise Directory Capability Manager Robert Loiseau emailed Quest Global Army Team Lead Jonathan Smith, explaining that "NETCOM has decided to divest itself of all Quest tools for the Army, but the use and need [for] those tools has not gone away." ECF No. 8-1 at 62–63. In this email, Mr. Loiseau asked "what [it] would . . . cost to use just those tools (Change Manager, Active Roles) for each theater, with training and support for

those tools[.]" *Id.* Mr. Loiseau noted that this information would be used "to advise NETCOM leadership or the [Regional Cyber Commands] on what is required, funding wise, to retain the license and support for these tools." *Id.* Mr. Smith responded to Mr. Loiseau on August 10, 2023, providing a cost breakdown of the Army's use of Change Manager, Active Roles, and other related tools. *Id.* at 60–62.

The next day, Mr. Loiseau clarified that NETCOM was interested only in the Active Roles and Change Auditor tools, and that these licenses would be used exclusively for NETCOM. *Id.* at 60. In that email, Mr. Loiseau explained his understanding that "the other tools that Quest offers (under the current contract) were never used because they required additional infrastructure that [the Army] could not support." *Id.* On August 18, 2023, Mr. Smith responded, clarifying that Quest "products work within [the Army's] networking structure." *Id.* at 59.

Separately, Iron Bow attempted to demonstrate the Delivery Order's necessity to the Army by giving an in-person presentation to the Agency in February of 2024. *Id.* at 65–67; ECF No. 8 ¶ 44. Despite Iron Bow's effort to persuade the Army to further extend the contract, the Delivery Order expired on May 2, 2024, at the conclusion of the second option year. ECF No. 8 ¶ 46.

Iron Bow alleges that, since the expiration of the Delivery Order, the Agency must have been using substitute products to provide some or all of the functions previously provided by the Products under the Delivery Order because they are essential to the Agency's use of AD systems. *Id.* ¶¶ 66–67. For example, Iron Bow asserts that many of these functionalities, including "group account management, . . . role-based security, and identity administration," are "necessary requirements for AD management." *Id.* ¶ 68. Other functionalities previously provided by the Products, such as "identify[ing] which users or administrators made changes to AD objects, restor[ing] deleted objects, and monitor[ing] and secur[ing] ADs against exploits," are similarly

"necessary to manage complex ADs safely and efficiently." *Id.* ¶ 69. Thus, according to Iron Bow, the Army must be "us[ing] native Microsoft tools or other products to provide these functionalities." *Id.* Similarly, Iron Bow argues that "device discovery, compliance evaluation, continuous monitoring, and access control [through] managing user privileges and sign-ins" are all "critical functions of AD management" that the Army must necessarily be acquiring through other means. *Id.* ¶ 70. Finally, Quest InTrust's "real-time log monitoring and alerting enables [the Army] to respond to threats by deploying automated responses to suspicious activity," which "is a critical element of AD management" that Iron Bow alleges is either being provided through a substitute product or "the native functionality of Microsoft AD products." *Id.* ¶ 71.

### C. Procedural History

On October 21, 2024, Iron Bow submitted a certified claim to the contracting officer seeking $24,969,800 in damages, the contract value of the two unexercised option years, for the Army's alleged breach of its obligations under the Delivery Order. *Id.* ¶ 50; ECF No. 8-1 at 2. Specifically, Iron Bow asserted that the Agency breached the Delivery Order "by failing to exercise the final two option periods for reasons apparently unrelated to the availability of appropriations" and by "using products or devices having functions that the Products performed." ECF No. 8-1 at 2. On January 24, 2025, the contracting officer denied Iron Bow's certified claim. ECF No. 8 ¶ 54; Ex. 2 to Pl.'s First Am. Compl. at 2–3, ECF No. 8-2.

Iron Bow filed its Complaint in this Court on March 5, 2025. *See* Pl.'s Compl., ECF No. 1. The Government filed a Motion to Dismiss Iron Bow's original Complaint on June 4, 2025. ECF No. 7. In response, Iron Bow filed its First Amended Complaint on June 25, 2025. ECF No. 8. Iron Bow's First Amended Complaint asserts four claims for relief. First, Iron Bow alleges that the Army's decision not to renew the Delivery Order for the third and fourth option years breached the terms of the Delivery Order, which required the Army to exercise all options subject only to

its receipt of appropriations. *Id.* ¶¶ 55–63. Second, Iron Bow contends that the Agency violated the non-substitution clause because the Agency necessarily used other products providing some or all of the same functions as the Products under the Delivery Order. *Id.* ¶¶ 64–72. Third, Iron Bow asserts that the Army breached the Delivery Order by materially misrepresenting (a) its intent to exercise all options and (b) that the Products would be essential to the Government for the full term, which the Delivery Order defined to include the base year and multiple option periods. *Id.* ¶¶ 73–80. Fourth, Iron Bow alleges that the Agency breached the implied duty of good faith and fair dealing by interfering with Iron Bow's reasonable expectation that the Agency would exercise all options under the Delivery Order. *Id.* ¶¶ 81–85.

The Government filed the instant Motion to Dismiss on July 16, 2025. *See* Gov't's Mot. to Dismiss, ECF No. 10. The Government argues that Iron Bow's First Amended Complaint must be dismissed in its entirety because Iron Bow's interpretation of the Delivery Order, as requiring the Army to exercise all options subject only to receipt of appropriations, would violate the ADA. *See id.* at 18–29. The Government further contends that Iron Bow's interpretation of the non-substitution clause would violate the ADA, the FAR, and CICA. *Id.* at 29–32. Next, the Government argues that Iron Bow's material misrepresentation claim must be dismissed because any assertion as to the Agency's future intent to exercise all options and its belief about the essentiality of the Products for the full term cannot form the basis for such claim. *Id.* at 33–36. Finally, the Government maintains that Iron Bow's claim for breach of the covenant of good faith and fair dealing must be dismissed because Iron Bow could not have reasonably expected the Army to violate the ADA, the FAR, or CICA. *Id.* at 36–37.

Iron Bow filed its Response on August 13, 2025. *See* Pl.'s Opp'n to Gov't's Mot. to Dismiss, ECF No. 11. In its Response, Iron Bow first argues that it adequately pled a breach of

contract claim based on the Agency's non-renewal decision and violation of the non-substitution clause because the Delivery Order terms comply with the ADA, the FAR, and CICA. *Id.* at 11–27. Second, Iron Bow contends that it adequately pled a material misrepresentation claim because its theory of liability does not rest upon an assertion as to a future event, but rather the Army's intent at the time of contract, which it had authority to represent. *Id.* at 27–28. Third, Iron Bow asserts it adequately pled a breach of the covenant of good faith and fair dealing because its expectations were reasonable and consistent with the ADA, the FAR, and CICA. *Id.* at 28–29. Alternatively, Iron Bow contends that factual issues preclude dismissal. *Id.* at 29–30. The Government filed its Reply on August 27, 2025. *See* Gov't's Reply in Supp. of Mot. to Dismiss, ECF No. 12. The Court heard oral argument on January 16, 2026. *See* Min. Entry, Jan. 16, 2026. The motion is ripe for disposition.

## II. LEGAL STANDARDS

### A. Dismissal for Failure to State a Claim

A court may dismiss an action if it fails to state a claim for which relief may be granted. RCFC 12(b)(6). To avoid dismissal under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Pupols v. U.S. Pat. & Trademark Off.*, 413 F. App'x 232, 234 (Fed. Cir. 2011) (citing *Ashcroft*, 556 U.S. at 677–78). Although a complaint need not contain detailed factual allegations to raise a plausible claim, the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see id.* (explaining that "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation'"

(quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986))). In reviewing a Rule 12(b)(6) motion, a court may consider the complaint itself, "the written instruments attached to it as exhibits, 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Todd Constr., L.P. v. United States*, 94 Fed. Cl. 100, 114 (2010) (quoting *Tellabs, Inc. v. Makor Issues & Rts. Ltd.*, 551 U.S. 308, 322 (2007)), *aff'd*, 656 F.3d 1306 (Fed. Cir. 2011). The reviewing court "must assume all well-pled factual allegations are true and indulge in all reasonable inferences in favor of the nonmovant." *United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1327–28 (Fed. Cir. 2006) (quoting *Anaheim Gardens v. United States*, 444 F.3d 1309, 1314–15 (Fed. Cir. 2006)).

**B. Breach of Contract**

"When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *Franconia Assocs. v. United States*, 536 U.S. 129, 141 (2002) (quoting *Mobil Oil Expl. & Producing Se., Inc. v. United States*, 530 U.S. 604, 607 (2000)). To plead a breach of contract claim against the Government, a plaintiff must plausibly allege: "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *San Carlos Irr. & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989). A plaintiff sufficiently pleads the first element—a valid express or implied-in-fact contract with the Government—where it alleges facts showing "(1) mutuality of intent, (2) consideration, (3) an unambiguous offer and acceptance, and (4) 'actual authority' on the part of the government's representative to bind the government in contract." *Hanlin v. United States*, 316 F.3d 1325, 1328 (Fed. Cir. 2003) (quoting *City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed. Cir. 1998)). In assessing whether a breach of contract claim survives dismissal, "the court must interpret the contract's provisions to ascertain whether the facts plaintiff alleges would, if

true, establish a breach of contract." *Bell/Heery v. United States*, 739 F.3d 1324, 1330 (Fed. Cir. 2014). Finally, the plaintiff must allege its damages were caused by the breach by pleading facts showing that "(1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach [was] a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005).

## III. DISCUSSION

The Court grants the Government's Motion to Dismiss as to Count I—breach of contract based on the Army's non-renewal decision—because the Delivery Order did not and could not require the Army to exercise all options. The Court likewise grants the Government's motion as to Count III—breach of contract based on the Agency's alleged material misrepresentation—because Iron Bow has not plausibly alleged that the Army misrepresented its intent at the time of contract. The remainder of the Government's motion is denied. Count II—breach of the non-substitution clause—states a plausible claim because that provision survived expiration of the Delivery Order and did not violate the ADA, the FAR, or CICA. Count IV—breach of the covenant of good faith and fair dealing—also survives dismissal because the claim is not redundant of Count III and Iron Bow's alleged expectations were not unreasonable as a matter of law.

### A. Iron Bow's Claim for Breach of Contract Based on the Army's Non-Renewal Decision Fails as a Matter of Law.

Iron Bow's allegation that the Army breached the Delivery Order by failing to exercise the third and fourth option years fails to state a claim because the Delivery Order did not require the Army to exercise the option years and, in any event, the Agency lacked authority under the ADA to agree to an option-renewal term consistent with Iron Bow's alleged interpretation. As such,

Iron Bow's allegations fail to satisfy the first element of a breach of contract claim—*i.e.*, that the alleged obligation or duty arose out of the contract. *Bell/Heery*, 739 F.3d at 1330.

1. The Delivery Order Did Not Require the Army to Exercise the Option Years.

Iron Bow's first count must be dismissed because the Agency did not contractually commit to exercising all option years. In analyzing Iron Bow's claim, the Court must "begin with the plain language" of the Delivery Order. *Hunt Constr. Grp., Inc. v. United States*, 281 F.3d 1369, 1372 (Fed. Cir. 2002) (quoting *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996)). When interpreting contract terms, the Court must give the contract language its "ordinary meaning unless the parties mutually intended and agreed to an alternative meaning." *Harris v. Dep't of Veterans Affs.*, 142 F.3d 1463, 1467 (Fed. Cir. 1998). And it must consider the contract "as a whole and interpret[] [it] so as to harmonize and give reasonable meaning to all of its parts," such that no portion is rendered "useless, inexplicable, void, or superfluous." *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004). "When the contract language is unambiguous on its face, [the Court's] inquiry ends, and the plain language of the contract controls." *Hunt*, 281 F.3d at 1373. Contract interpretation is a matter of law and may be addressed in resolving a motion to dismiss if the language is unambiguous. *Bell/Heery*, 739 F.3d at 1330.

The contract interpretation dispute underlying Count I centers on the amount of discretion the Army retained to exercise option years. As the Government emphasizes, the standard option clause, FAR 52.217-9, which was incorporated into the Delivery Order, *see* ECF No. 8-1 at 22, provided the Army "complete discretion" as to whether "to exercise the option years." *Beacon Point Assocs., LLC v. Dep't of Veterans Affs.*, 139 F.4th 1306, 1308 (Fed. Cir. 2025) (interpreting the plain language of FAR 52.217-9). Iron Bow argues, however, that the payment terms of its

proposal, which were also incorporated into the Delivery Order,[2] limited the Agency's discretion under FAR 52.217-9 by stating that the "Government intends to exercise all options and remit amounts owing in each option period . . . subject only to its receipt of appropriations from Congress," which the "Government will use best efforts to obtain." ECF No. 8-1 at 29. According to Iron Bow, this option-renewal term "required" the Army to exercise all options provided that it received appropriations. *See* ECF No. 8 ¶ 56. The Government counters that this term was merely a statement of the Army's "present intention," at the time of contract, rather than "a statement of future obligation." ECF No. 10 at 26. The Court agrees with the Government.

The ordinary meaning of the payment term stating that the "Government intends to exercise all options," ECF No. 8-1 at 29, is that the Army, at the time of entering the Delivery Order, *planned* to exercise all options. It does not mean that the Army was *contractually required* to do so. The plain meaning of the word "intend" is "to have in mind" or to "plan." *Intend*, *The American Heritage Dictionary* (5th ed. 2022). Conversely, the ordinary meaning of the word "require" is "to impose an obligation on" or to "compel." *Require*, *The American Heritage Dictionary* (5th ed. 2022). This interpretation is also consistent with caselaw analyzing similar expressions of intent. *See, e.g.*, *Westlands Water Dist. v. United States*, 109 Fed. Cl. 177, 199 (2013) (holding that "government representations are not binding contractual obligations unless stated as an undertaking rather than an intention"); *Uniq Computer Corp. ex rel. U.S. Leasing Corp. v. United States*, 20 Cl. Ct. 222, 232 (1990) (holding that a "statement by the optionee of a present intention to accept in the future is different from a statement of an intention to accept now" (quoting Arthur L. Corbin, *Corbin on Contracts, A Comprehensive Treatise on the Working Rules*

---

[2] At this stage, neither party disputes that the payment terms of Iron Bow's proposal were incorporated into the Delivery Order. *See* Oral Arg. Tr. at 17:22–18:1, ECF No. 16.

*of Contract Law* § 264 (1963))); *Chattler v. United States*, 632 F.3d 1324, 1333 (Fed. Cir. 2011) ("The obligation of the government, if it is to be held liable, must be stated in the form of an undertaking, not as a mere prediction or statement of opinion or intention." (quoting *Cutler-Hammer, Inc. v. United States*, 441 F.2d 1179, 1182 (Ct. Cl. 1971)).

Thus, reading the Delivery Order's language as a whole and in harmony, as the Court must, *see NVT Techs.*, 370 F.3d at 1159, the Army retained complete discretion to exercise option years while also representing its contemporaneous plan to exercise all options subject to its receipt of appropriations, although it did not commit itself to do so.[3]

Iron Bow argues that this interpretation is unreasonable because the option-renewal term specified only one qualifier on the Agency's intent to exercise the options—that it was "subject ***only*** . . . to its receipts of appropriations." ECF No. 11 at 19 (emphasis added in Iron Bow's Opposition) (citing ECF No. 8 ¶ 19 and ECF No. 8-1 at 29). In Iron Bow's view, reading the term as a statement of present intention rather than one of future obligation would render this qualifying language superfluous. *Id.* at 19–20. The Court disagrees. The sole qualifier is not superfluous as it modified the Army's present intent. That is, the Agency indicated its intent was to exercise all options unless appropriations were not available.

[3] Relying on FAR 52.217-9, the Government invokes the order of precedence provision in Iron Bow's payment terms, which provided that "[i]f any of these payment terms conflict[] with any other provision of this contract or any other document, the FAR terms prevail." ECF No. 8-1 at 29. The Court need not resort to the order of precedence provision because the option-renewal term does not conflict with FAR 52.217-9. Rather, as explained, Iron Bow's term reflected the Agency's present intent to exercise the option years but did not obligate the Agency to do so. *See Int'l Transducer Corp. v. United States*, 30 Fed. Cl. 522, 526 (1994) ("Established court precedent and rules of construction require that contract provisions should not be interpreted as conflicting with one another unless there is no other possible reasonable construction of the language." (citing *Hol–Gar Mfg. Corp. v. United States*, 169 Ct. Cl. 384, 395 (1965))), *aff'd*, 48 F.3d 1235 (Fed. Cir. 1995); *Sperry Corp. v. United States*, 845 F.2d 965, 968 (Fed. Cir. 1988) (affirming decision declining to apply order of precedence clause where no inconsistency existed).

In any event, Iron Bow's attempt to use the qualifying language to wholly alter the meaning of the first part of the option-renewal term is a leap too far. A "qualification" is a "modification or limitation of terms or language." *Qualification*, *Black's Law Dictionary* (12th ed. 2024). And the word "modify" is generally understood to mean "to make modest adjustments and additions to existing provisions, not transform them." *Biden v. Nebraska*, 600 U.S. 477, 494–95 (2023) (citing *Webster's Third New International Dictionary* 1952 (2002); and *Modify*, *Black's Law Dictionary* (11th ed. 2019)). Iron Bow seeks to use this qualifier to replace the word "intends" with "is required to." *See* ECF No. 11 at 19–20. Such an effort "transform[s]" the meaning of the term rather than "make[s] modest adjustments." *Biden*, 600 U.S. at 494 (holding that a statute giving the agency authority to "waive or modify" existing statutory or regulatory provisions did not give the agency authority "to rewrite th[e] statute from the ground up"). Thus, Iron Bow's reliance on the option-renewal term's sole modifier is unavailing.

Finally, although the Government invokes the doctrine of *contra proferentem*, *see* ECF No. 10 at 26–27, the Court finds the doctrine irrelevant here because the option-renewal term is unambiguous. "[T]he rule of *contra proferentem* . . . requires that ambiguous or unclear terms that are subject to more than one reasonable interpretation be construed against the party who drafted the document." *Turner Constr. Co. v. United States*, 367 F.3d 1319, 1321 (Fed. Cir. 2004). The plain language of the relevant term is only subject to one reasonable interpretation: that the Army, at the time the parties entered into the Delivery Order, intended to exercise all option years under the Delivery Order subject only to its receipt of appropriations. Iron Bow seeks to rewrite the word "intends" to mean "is required to," but such an interpretation is unreasonable as it is inconsistent with the ordinary meaning of the option-renewal term. Thus, the Delivery Order did not require the Agency to exercise all option periods subject only to its receipt of appropriations.

2. <u>The Army Lacked Authority at the Time of Contract to Contractually Obligate the Government to Exercise All Options.</u>

Even if the meaning of the term at issue was ambiguous, the ADA prohibits an interpretation under which the Agency committed itself at the time of contract to exercising all options. The Government argues that Iron Bow's interpretation of the option-renewal term would conflict with the ADA, which—under U.S. Supreme Court precedent—provides that a contract extending beyond the initial period of available appropriations can only bind the Government for each subsequent period if an appropriation is made for the period *and* the agency affirmatively renews the contract under the authority of that appropriation. *See* ECF No. 10 at 18–25. Iron Bow counters that its interpretation of the option-renewal term complies with the ADA because the Delivery Order did not contemplate automatic renewal and instead only limited the Army's discretion not to exercise the options. *See* ECF No. 11 at 12–19. The Court finds that Iron Bow's interpretation of the Delivery Order impermissibly limits the Agency's discretion as to whether to take affirmative action to exercise the option years such that, under Iron Bow's reading, the Agency essentially agreed to exercise all option periods at the time of entering the Delivery Order in violation of the ADA.

With limited exceptions not relevant here, the ADA prohibits federal employees or agencies from involving the "government in a contract or obligation for the payment of money before an appropriation is made." 31 U.S.C. § 1341(a)(1)(B). Thus, government employees and agencies lack statutory authority to "enter[] into a contract for future payment of money in advance of, or in excess of, an existing appropriation." *Hercules Inc. v. United States*, 516 U.S. 417, 427 (1996). Where a government agent, "acting beyond the scope of their authority," purports to do so, "the government is not bound." *Johnson Mgmt. Grp. CFC, Inc. v. Martinez*, 308 F.3d 1245, 1255–56 (Fed. Cir. 2002).

Given the ADA's prohibition against contracting in advance of existing appropriations, and the associated limitation on the Government's authority to contract for future needs, the Supreme Court has held that two requirements must be met before a contract funded with a one-year appropriation may bind the Government for additional years beyond the first.[4] *Leiter v. United States*, 271 U.S. 204, 207 (1926). First, an "appropriation [must] be made available for the payment." *Id.* Second, the Government must "affirmatively continue the [contract] for such subsequent year." *Id.* Put differently, to bind the Government for each subsequent year, the Supreme Court's precedent interprets the ADA to require that the Government must "in effect, make a new [contract] for [each subsequent] year under the authority of such appropriation." *Goodyear Tire & Rubber Co. v. United States*, 276 U.S. 287, 292 (1928).

Courts and boards have consistently applied *Leiter* and *Goodyear* as precluding interpretations of contract terms that purport to bind the Government beyond the period of available appropriations. For example, other judges of the Court of Federal Claims have interpreted *Leiter* and *Goodyear* to require that, where an agency enters into a multi-year contract with a one-year appropriation, the Government must affirmatively renew the contract following receipt of subsequent appropriations in order to bind the Government for each succeeding period. *See Cray Rsch., Inc. v. United States*, 44 Fed. Cl. 327, 333 (1999) (construing contract as affording the Government the "unilateral right to renew" because a contrary interpretation would not result in "a valid and binding document"); *RCS Enters. v. United States*, 57 Fed. Cl. 590, 595 (2003)

[4] Congressional appropriations are categorized based on the duration of their availability for obligation: (1) a one-year appropriation "is available for obligation only during a specific fiscal year"; (2) a multiple-year appropriation "is available for obligation for a definite period of time in excess of one fiscal year"; and (3) a no-year appropriation "is available for obligation for an indefinite period." Gov't Accountability Off., *Principles of Federal Appropriations Law* 2-9, ch. 2, § A.8.a, GAO-16-464SP (4th ed., 2016 rev.).

(holding that a "contract, on its face, violates the ADA" if the remaining years after the base years were not "true options" such that "the Government merely could decline to exercise its option with respect to those years"). At least one other court has similarly interpreted *Leiter* and *Goodyear* to hold that "[a] contract will only bind the government in subsequent years if appropriations are made in those 'out years,' and if the government affirmatively renews the contract." *Williams v. District of Columbia*, 902 A.2d 91, 95 (D.C. 2006). Likewise, the Armed Services Board of Contract Appeals ("ASBCA") has interpreted *Leiter* as "preclud[ing] the initial contract from imposing upon future government officials a duty to automatically renew the lease." *Mach I AREP Carlyle Ctr. LLC*, ASBCA No. 59821, 16-1 BCA ¶ 36,389 at 177,419 (June 1, 2016).

At the time of issuing the Delivery Order to Iron Bow, the Army did not have authority to commit to an obligation for the payment of money for performance of the contract beyond the 2021 fiscal year. Iron Bow does not allege the existence of either multiple-year or no-year appropriations, and indeed, the Government explains that the Delivery Order's Line of Accounting indicates that the Army used a one-year appropriation limited to fiscal year 2021. *See* ECF No. 10 at 10–11. Thus, even viewing the facts in the light most favorable to Iron Bow, the Agency utilized appropriations limited to fiscal year 2021 to enter into the Delivery Order and could not, under the ADA, have committed to procuring the Products during the option years at that time. 31 U.S.C. § 1341(a)(1)(B); *Hercules*, 516 U.S. at 427–28.

Accordingly, the Government could only be bound for each option year if the Army received appropriations and then affirmatively extended the Delivery Order for that year. *Leiter*, 271 U.S. at 207; *Goodyear*, 276 U.S. at 292. Although appropriations became available for the

third and fourth option years,[5] the Army chose not to renew the Delivery Order at the conclusion of the second option year. *See* ECF No. 8 ¶¶ 34, 46; *see also* ECF No. 8-1 at 54 (email from the contracting officer indicating that "the government will not be exercising the [third] option year"). It was, therefore, not contractually bound to another option year under the Delivery Order after option year two.

Iron Bow claims that the Army's non-renewal decision violated the terms of the Delivery Order, which limited the Agency's discretion to renew the contract for each option year. *See* ECF No. 11 at 13–18. The Government, however, contends that this reading of the Delivery Order violates the ADA, as it fails to sufficiently provide for affirmative action on the part of the Government and instead compels renewal of the Delivery Order by operation of its terms. ECF No. 12 at 8–13. That is, in the Government's view, an interpretation of the Delivery Order that compels the Army to affirmatively exercise the option years is just as violative of the ADA as an interpretation that, at the time of entering the Delivery Order, commits the Army to doing so. The Court agrees with the Government that Iron Bow's argument misconstrues the ADA's limitation on the Government's authority to contract in advance of appropriations because a lack of automatic renewal is insufficient to meet *Leiter*'s test where the contract terms compel future renewal beyond the period of existing appropriations.

As discussed, *Leiter* and *Goodyear* require that "the Government . . . affirmatively continue the [contract]" for each option year, thus "making a *new* [contract] under the authority of such appropriation for the subsequent year." *Leiter*, 271 U.S. at 207 (emphasis added). In

[5] For purposes of resolving the Government's Motion to Dismiss, the Court accepts as true Iron Bow's allegation that appropriations were available. ECF No. 8 ¶ 58; *United Pac. Ins. Co.*, 464 F.3d at 1327–28; *see also* ECF No. 16 at 18:2–8 (Government counsel confirming that "for purposes of [the] motion to dismiss, [the Government is] assuming that there are funds available").

*Goodyear*, the Supreme Court made explicit that, "[i]n order to bind the Government for" periods beyond the initial fiscal year, it is necessary "that *after the available appropriation had been made*, the Government should affirmatively continue the [contract] for that year." 276 U.S. at 292 (emphasis added). Iron Bow's interpretation of *Leiter*'s requirement that the Government "affirmatively continue" the contract gives it only nominal value, rather than any real effect. By only permitting the Army to refuse to exercise the option if it failed to receive appropriations, the Delivery Order would cabin the Army's discretion so significantly that the Agency cannot be said to have retained any true ability to decide whether to affirmatively continue the Delivery Order. In reality, then, the Agency would have committed to exercising the option years at the time of contract, subject to only a very limited exception. This would not comply with *Leiter* and *Goodyear*'s requirement that an agency affirmatively continue the contract under the authority of future appropriations but would, in effect, permit an agency to commit to exercising future option years in advance of existing appropriations. As a result, such an interpretation is inconsistent with the ADA.

While not binding, the ASBCA considered and ultimately rejected a similar argument in *Mach I*, ASBCA No. 59821, 16-1 BCA ¶ 36,389. There, the ASBCA concluded that:

> [I]t would be nonsensical for the Supreme Court to have held . . . that government officials could not contract for a multi-year lease to be renewed automatically in the event that there was sufficient funding, but could contract for the exact same thing by including a term that future government officials would renew the contract every year in the event that there was sufficient funding.

*Id.* at 177,419. Iron Bow's argument suffers from the same logical defect as the contractor's argument in *Mach I*, and Iron Bow has not persuasively explained why the Supreme Court's holdings in *Leiter* and *Goodyear* should be interpreted in a different manner here. Contrary to Iron Bow's argument, that the Delivery Order contemplated the Agency taking required affirmative

action, allowing the Army to "decline to proceed" only if appropriations were not available, ECF No. 11 at 13, did not meet the requirements of *Leiter* and *Goodyear*.

In support of its argument, Iron Bow cites two nonbinding cases suggesting that the Government *could* contractually limit its discretion to decline to exercise options. *See id.* at 18 (citing *Northrop Grumman Computing Sys. v. United States* (*Northrop I*), 93 Fed. Cl. 144, 149 (2010) ("[I]t is well-accepted that such an option may, nevertheless, be limited by other contractual provisions."); and *Monarch Enters., Inc.*, ASBCA No. 31375, 86-3 BCA ¶ 19,227 at 97,223 (Aug. 7, 1986) ("The Government could, of course, write an 'option' clause . . . surrendering some of the discretion it normally enjoys . . . [and] obligating itself to exercise the 'option' under certain conditions.")). But neither case addressed the extent to which such a limiting clause would comply with *Leiter* and *Goodyear* because both cases held that the agency had not limited its discretion. Instead, as the Government correctly argues, Iron Bow's "decline to proceed" formulation is inconsistent with *Leiter* and *Goodyear*'s requirement that the Government affirmatively renew the contract under the authority of the subsequent appropriation. *See* ECF No. 12 at 12–13.

For example, *Northrop I* proposed that a clause "under which [the Government] would have been obliged, in some circumstances, to renew the contract [] would not necessarily run afoul of the [ADA]" because "some forms of binding options or multiyear contracts have been held not to violate this statute." 93 Fed. Cl. at 150. That case, however, involved a contract that had been funded through discretionary asset forfeiture funds, rather than congressional appropriations, and thus the court did not consider the Supreme Court's binding precedent in *Leiter* and *Goodyear*. *Id.* at 147. In any event, the *Northrop I* court later found that the contract did not obligate the Government to exercise the options. *Northrop Grumman Computing Sys., Inc. v. United States* (*Northrop II*), 120 Fed. Cl. 460, 466 (2015) (granting the Government's motion for summary

judgment after remand and finding "no indication that, under the contract terms, plaintiff was entitled to receive" payments "for the three unexercised option years"), *aff'd*, 823 F.3d 1364 (Fed. Cir. 2016).

Similarly, in *Monarch*, the ASBCA suggested that the Government could "surrender[] some of the discretion it normally enjoys . . . and obligat[e] itself to exercise the 'option' under certain conditions," but found that the agency had not done so. ASBCA No. 31375, 86-3 BCA ¶ 19,227 at 97,223. Accordingly, the ASBCA did not analyze under what circumstances such limitations would or would not violate the ADA. At most, these cases support the proposition that the Government could, in theory, limit its discretion to decline to exercise options. In neither case, however, did the Government actually do so. Iron Bow seeks to expand this theoretical possibility of *limiting* the Government's discretion to *eliminating* all of the Government's discretion and obligating the Government to exercise option years so long as appropriations are available. Iron Bow does not cite—and the Court is not aware of—any legal authority for this logical leap.

Iron Bow also relies on several cases supporting the validity of contract terms obligating the Government to use its best efforts to obtain appropriations to continue a contract. *See* ECF No. 11 at 24 (citing *Hughes Commc'ns Galaxy, Inc. v. United States*, 998 F.2d 953, 957 n.7 (Fed. Cir. 1993); *Mun. Leasing Corp. v. United States* (*Mun. Leasing I*), 1 Cl. Ct. 771, 774–75 (1983); *Northrop Grumman Computing Sys., Inc.* (*Northrop III*), GSBCA No. 16367, 06-2 BCA ¶ 33,324 (June 26, 2006); and *ViON Corp. v. United States*, 122 Fed. Cl. 559, 578 (2015)); Oral Arg. Tr. at 32:10–33:1, ECF No. 16 (discussing *Mun. Leasing Corp. v. United States* (*Mun. Leasing II*), 7 Cl. Ct. 43 (1984)). These cases similarly fail to advance Iron Bow's position here. *See, e.g.*, *Mun. Leasing II*, 7 Cl. Ct. at 46–47 (granting the plaintiff's motion for summary judgment but in the context of the Government's concession that it failed to use its best efforts to obtain

appropriations); *Hughes*, 998 F.2d at 957 n.7 (agreeing with the lower court that "best efforts contracts are routinely held valid" but in the context of a contract committing the agency to use best efforts to launch the plaintiff's satellites and where "the government did not challenge the validity of the contract"). Although Iron Bow's payment terms required the Army to use its best efforts to obtain appropriations, ECF No. 8-1 at 29, Iron Bow concedes that such term would only impact the outcome of the Government's Motion to Dismiss to the extent that the Government asserted unavailability of appropriations as a defense. *See* ECF No. 11 at 23–24. Because the Government assumes for purposes of resolving its motion that appropriations were available, ECF No. 16 at 18:2–8, neither the validity of the best-efforts term nor the Army's compliance therewith are relevant to resolving the Government's motion.

In short, none of the cases Iron Bow cites held that the Government could contractually obligate itself to exercise future option years subject only to the receipt of appropriations, nor that doing so would comply with the ADA. This is likely because such an interpretation would be inconsistent with the Supreme Court's binding precedent in *Leiter* and *Goodyear*. *See Mach I*, ASBCA No. 59821, 16-1 BCA ¶ 36,389 at 177,419 (interpreting *Leiter*, 271 U.S. at 207, as "preclud[ing] the initial contract from imposing upon future government officials a duty to automatically renew the lease").

Under binding precedent interpreting the ADA, the Army did not have authority to contractually obligate itself, at the time of contract, to exercise all option years under the Delivery Order. Accordingly, even assuming the terms of the Delivery Order were susceptible to such an interpretation, the Army could not be bound by it. *Johnson*, 308 F.3d at 1255–56. The Court must, therefore, grant the Government's Motion to Dismiss with respect to Count I.

**B. Iron Bow's Material Misrepresentation Claim Is Not Adequately Pled.**

The First Amended Complaint also fails to adequately allege a material misrepresentation claim. Iron Bow contends that the Army misrepresented that it "***intend[ed] to exercise all options*** . . . subject only to its receipt of appropriations" and that "***the Products [would] be essential to*** [the] Government ***for the full term***." ECF No. 8 ¶¶ 74–75 (emphases added in Iron Bow's First Amended Complaint) (quoting ECF No. 8-1 at 29). To establish a material misrepresentation, the plaintiff must plausibly allege "that the Government made an erroneous representation of a material fact that the contractor honestly and reasonably relied on to the contractor's detriment." *AT&T Commc'ns, Inc. v. Perry*, 296 F.3d 1307, 1312 (Fed. Cir. 2002) (quoting *T. Brown Constructors, Inc. v. Pena*, 132 F.3d 724, 729 (Fed. Cir. 1997)). "A misrepresentation is material 'if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so.'" *Id.* (quoting *T. Brown*, 132 F.3d at 729); *see also Kousisis v. United States*, 605 U.S. 114, 131 (2025) (explaining that "materiality asks whether the misrepresentation 'constitut[ed] an inducement or motive' to enter into a transaction" (alteration in original) (quoting *Smith v. Richards*, 38 U.S. 26, 39 (1839))).

The Government argues that Iron Bow's material misrepresentation claim must be dismissed for three reasons. First, the Government asserts that Iron Bow's misrepresentation theory improperly seeks to bind the Army through statements made at the time of contract that, under the ADA, could not have committed the Army to exercising all options nor affirmed the Army's need for the Products for the full term. ECF No. 10 at 33–36. Second, the Government argues that the representations at issue concern future events and thus cannot form the basis for a misrepresentation claim. *Id.* at 34–35. Third, the Government contends that Iron Bow fails to plead its claim with specificity and that the allegation is, therefore, speculative. ECF No. 12 at

21–22. The Court disagrees with the Government's first two arguments but agrees that Iron Bow's claim is inadequately pled.

1. The ADA Does Not Preclude Iron Bow's Material Misrepresentation Claim.

The ADA does not prohibit an agency from making, or a contractor from relying on, a representation regarding the Government's expected future needs, even beyond the period of available appropriations. While the Government is correct that "a representation about the Government's belief that it will continue to need to lease something cannot reasonably be construed as a guarantee that an option will be exercised," ECF No. 10 at 34–35 (quoting *Merlin Int'l, Inc. v. Dep't of Homeland Sec.*, CBCA No. 1012, 11-2 BCA ¶ 34,869 at 171,515 (Oct. 28, 2011)), this argument misinterprets Iron Bow's claim. Iron Bow's allegation is that, at the time of awarding the Delivery Order, the Army misrepresented its existing expectations regarding the option years because the Army knew, or had information indicating, that it would not exercise the option years or that the Products would not remain essential. *See* ECF No. 8 ¶¶ 78–79; ECF No. 11 at 27–28. Such a representation is distinct from a guarantee, or warranty, that the options would be exercised or that the Products would remain a *bona fide* need.

"[A] warranty is an assurance by one party to an agreement of the existence of a fact upon which the other party may rely." *Oman-Fischbach Int'l (JV) v. Pirie*, 276 F.3d 1380, 1383–84 (Fed. Cir. 2002) (quoting *Dale Constr. Co. v. United States*, 168 Ct. Cl. 692, 699 (1964)). Thus, a breach of warranty claim alleges that: "(1) the Government assured the plaintiff of the existence of a fact, (2) the Government intended that plaintiff be relieved of the duty to ascertain the existence of the fact for itself, and (3) the Government's assurance of that fact proved untrue." *Id.* (quoting *Kolar, Inc. v. United States*, 227 Ct. Cl. 445, 448 (1981)). Iron Bow does not allege a

breach of warranty.[6] Rather, Iron Bow alleges that the Army misrepresented its intentions regarding the option years at the time of contract. *See* ECF No. 8 ¶¶ 78–79. Such an assurance as to the Agency's *expectations* is not inconsistent with the ADA because, unlike Count I, Iron Bow does not allege in Count III that the Agency *guaranteed* or otherwise *committed* to exercising the option years or continuing to purchase the Products. *Id.* Instead, Iron Bow alleges that the Army inaccurately represented its expectations and intent at the time of contract. *Id.*; *see also Merlin*, CBCA No. 1012, 11-2 BCA ¶ 34,689 at 171,515 (finding that "the Government assured the contractor as to its *expectation* that the product it was purchasing would be needed for the full term" but "did not *warrant* that its need for the licenses would continue to exist for the full term" (emphasis added)). While the Government relies on *Merlin* to argue that Iron Bow's claim is precluded by the ADA, that case denied the contractor's breach of warranty claim rather than a claim of material misrepresentation. *See* CBCA No. 1012, 11-2 BCA ¶ 34,689 at 171,514–16. Thus, the ADA does not preclude Iron Bow's misrepresentation claim.

2. <u>Iron Bow's Material Misrepresentation Claim Is Not Limited to a Future Event.</u>

For similar reasons, Iron Bow's misrepresentation theory is not based on a representation limited to future events. "[A]n assertion 'limited to future events' may not form the basis for a misrepresentation claim." *CanPro Invs. Ltd. v. United States*, 130 Fed. Cl. 320, 343 (2017) (quoting *Fed. Grp., Inc. v. United States*, 67 Fed. Cl. 87, 102 (2005)). Instead, the "assertion must relate to something that is a fact at the time the assertion is made." *Id.* (quoting *Fed. Grp.*, 67 Fed. Cl. at 102). Accordingly, "[a]n assertion as to one's opinion or intention, including an intention to perform a promise, is a misrepresentation if the state of mind is other than as asserted." *Kenney*

[6] Count III of Iron Bow's original Complaint raised such a claim, *see* ECF No. 1 ¶¶ 69–74, but Count III of the First Amended Complaint is reframed as a material misrepresentation claim, *see* ECF No. 8 ¶¶ 73–80.

*Orthopedic, LLC v. United States*, 107 Fed. Cl. 85, 91 (2012) (quoting Restatement (Second) of Contracts § 159 cmt. d (1981)).

In *CanPro*, the plaintiff leased space to the General Services Administration for use as a local Social Security Administration ("SSA") office. 130 Fed. Cl. at 330–31. CanPro alleged that, during negotiations, one or both of the agencies "represented that visitors to the SSA during peak times would not exceed 250 per day" even though the agencies "knew or should have known that the number of visitors would be greater due to anticipated SSA office closings in the surrounding area." *Id.* at 331 (quotations omitted). According to CanPro, the actual number of daily visitors regularly exceeded 400–500, which caused overuse of the facility. *Id.* at 332–33. CanPro claimed, among other things, that one or both of the agencies misrepresented the expected volume of SSA visitors and that CanPro reasonably relied on that erroneous representation. *Id.* at 343. The court dismissed the misrepresentation claim finding that the agencies' representations regarding the "expected volume of SSA visitors" constituted a "future event" that could not "support a misrepresentation claim." *Id.* at 343–44. The court acknowledged that "a 'statement of intention' can be a misrepresentation" if it was "false at the time made." *Id.* at 343 (quoting *Fed. Grp.*, 67 Fed. Cl. at 102). Thus, the court distinguished between the agencies' "understandings concerning the expected daily SSA visitor volume at [the leased facility], which is a future event, and the [agencies'] representation of their understandings, which is a statement regarding a current state of mind." *Id.* at 344 n.11. The court concluded that, "[t]o constitute a misrepresentation, the [agencies] must have falsely stated their understandings during lease negotiations, rather than having correctly stated an understanding that later turned out to be false." *Id.*

Here, Iron Bow alleges that the Army misrepresented its intent to exercise all option years, and its understanding regarding the expected necessity of the Products, at the time of signing the

Delivery Order. *See* ECF No. 8 ¶ 78–79. If, at that time, the Agency's state of mind was "other than as asserted," then the Agency's false assertion of its present intent can support an actionable misrepresentation claim. *Kenney*, 107 Fed. Cl. at 91 (quotation omitted). Having based its misrepresentation claim on the Army's indication of its then-present intent, "which is a statement regarding a current state of mind," Iron Bow's allegation is not "limited to a future event." *CanPro*, 130 Fed. Cl. at 344 & n.11. If Iron Bow plausibly pled factual allegations to support its conclusion that the Agency's state of mind was other than as asserted at the time the representation was made, the fact that the Agency's state of mind was related to a future event would not alone preclude Iron Bow's misrepresentation claim.

3. <u>The First Amended Complaint Fails to Plausibly Allege that the Army Misrepresented Its Intent or Expectation at the Time of Contract.</u>

The defect in its pleading, however, is that Iron Bow does not support its misrepresentation theory with sufficient factual allegations to rise to the level of plausibility. Instead, as the Government correctly argues, "Iron Bow's allegation does not rise above a 'speculative level.'" ECF No. 12 at 21 (quoting *Twombly*, 550 U.S. at 555). This is because the only factual allegation Iron Bow offers to support its theory is equally consistent with the Agency having accurately represented its state of mind at the time of contract award, even if that expectation turned out to be incorrect.

The First Amended Complaint alleges that the Army's "representations that it intended to exercise all options and that the Products would be essential for the full Term of the Contract were false" because "[t]he Army did not exercise the third and fourth option years, despite availability of appropriations." ECF No. 8 ¶ 78. Yet, the fact that the Army represented an intent to exercise all options, and subsequently failed to do so, does not plausibly suggest that the Army's representations were false at the time they were made. *See Fed. Grp.*, 67 Fed. Cl. at 103 (holding

conduct that "occurred after the contract was signed" provided "no evidence that defendant lacked the intention, at the time of the execution of the contract," to perform as promised). Instead, these facts are equally consistent with the conclusion that the Army "correctly stated an understanding that later turned out to be false," which cannot support a misrepresentation claim. *CanPro*, 130 Fed. Cl. at 344 n.11; *see also Twombly*, 550 U.S. at 557 (discussing "[t]he need at the pleading stage for allegations plausibly suggesting (not merely consistent with)" the plaintiff's theory of liability). Moreover, as noted by the Government, Iron Bow's bald assertion that the Army "failed to use and disclose all information reasonably available," ECF No. 8 ¶ 79, fails to plead with any level of specificity what fact or facts the Army possessed and failed to use or disclose. *See Papasan*, 478 U.S. at 286 (explaining courts "are not bound to accept . . . a legal conclusion couched as a factual allegation"); *Twombly*, 550 U.S. at 555 (emphasizing that a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"). Thus, Iron Bow's First Amended Complaint does not plead factual allegations sufficient to support its misrepresentation claim.

At oral argument, Iron Bow explained that the Army "would necessarily have had some other information about changes in its software plans" at the time of contract because "these kinds of things don't happen overnight." ECF No. 16 at 36:3–14. Iron Bow argues that "the wheels were already in motion to make changes at the time when [the Army] entered into the contract." *Id.* at 37:6–15. In other words, Iron Bow suggests that the Agency represented that it intended to exercise all options and that the Products would remain essential for the full term while simultaneously making plans inconsistent with these representations. Iron Bow did not plead this allegation in its First Amended Complaint. *See* ECF No. 8 ¶¶ 78–79 (alleging that the Agency's representations were false based solely on the fact that "[t]he Army did not exercise the third and

fourth option years, despite availability of appropriations"). Therefore, the Court need not rule on whether this additional allegation would "nudge[]" Iron Bow's claim that the Agency's representations were false at the time made "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 547.[7]

Accordingly, the Government's Motion to Dismiss Count III is granted. Insofar as Iron Bow maintains that it could amend its First Amended Complaint to offer sufficient factual allegations to plead a material misrepresentation claim, *see* ECF No. 16 at 38:6–12, Iron Bow may file a motion seeking leave to amend.

### C. Iron Bow Has Adequately Pled a Breach of the Non-Substitution Clause.

Iron Bow's First Amended Complaint sufficiently alleges that the Army breached the Delivery Order's non-substitution clause by acquiring alternate products during the third and fourth option years. The Government contends that Iron Bow fails to state a claim for breach of the non-substitution clause because any promise by the Agency under the non-substitution clause expired with the Delivery Order at the end of the second option year and Iron Bow's interpretation of the non-substitution clause would violate the ADA, the FAR, and CICA. Upon consideration, the Court finds none of these arguments sufficient to dismiss Count II of Iron Bow's First Amended Complaint.

---

[7] In reply, the Government argues that Iron Bow is alleging a superior knowledge theory. *See* ECF No. 12 at 21 (citing *AT&T*, 296 F.3d at 1312). At oral argument, however, Iron Bow disclaimed such a theory, explaining that its claim is "based on the representations in the contract," and any other information regarding what the Army did or did not know at the time of contract "is relevant only to demonstrate that the information in the contract is a misrepresentation." ECF No. 16 at 36:15–21. Even if Iron Bow's allegation could be construed as alleging a superior knowledge theory, such an allegation is still inadequately pled as Iron Bow does not identify what fact(s) constitute "vital knowledge" that the Army possessed but failed to provide. *See AT&T*, 296 F.3d at 1312 (quoting *GAF Corp. v. United States*, 932 F.2d 947, 949 (Fed. Cir. 1991)).

The Court acknowledges the apparent tension between this holding and its conclusion regarding the interpretation and enforceability of the option-renewal term. *See supra* § III.A. But while the plain language of the option-renewal term did not obligate the Army to exercise all option years, and such an interpretation would violate the ADA, it does not necessarily follow that all of the Army's commitments under the Delivery Order expired with it. Instead, the Court must interpret each of the Delivery Order's terms to ascertain the intended meaning, and it is apparent that the Delivery Order contemplated that these two terms would serve distinct functions. The term indicating that the "Government intends to exercise all options," ECF No. 8-1 at 29, is just that—a statement of the Army's present intent. The non-substitution clause, on the other hand, committed the Army not to procure substitute products during the full term and, by its plain language, only came into effect in the event that the Delivery Order ended before the full term expired. The option-renewal term and non-substitution clause are thus distinct, and the Court's finding that Iron Bow's breach claim based upon one of them must be dismissed does not necessarily dictate that Iron Bow's breach claim based on the other must also be dismissed.

1. Iron Bow Has Alleged a *Prima Facie* Claim for Breach of Contract Based on the Plain Language of the Non-Substitution Clause.

The Court finds that Iron Bow has pled a *prima facie* claim of breach of the non-substitution clause. Iron Bow alleges that: (1) the non-substitution clause imposed on the Army a duty not to substitute the Products during the full term of the Delivery Order, and (2) the Government breached that duty because the Products' functions are essential to the Army's use of AD systems and therefore must have been replaced with products from a provider other than Iron Bow. *See* ECF No. 8 ¶¶ 64–72; *Bell/Heery*, 739 F.3d at 1330. The non-substitution clause stated that, "[i]n the event of any termination or expiration of this contract prior to the end of the Term, Government will not during the Term replace the Products with or use products or devices having functions that

the Products perform." ECF No. 8-1 at 29. The Delivery Order defined the "Term" as "the base period and multiple option periods." *Id.* The "Products" were defined as "the products and/or services described in this contract." *Id.* The plain language of the non-substitution clause therefore required that the Agency not replace the Products with alternate products if the Delivery Order terminated or expired prior to the end of the fourth option year. Iron Bow has sufficiently pled a breach of this duty by alleging that the "critical" nature of the functionalities provided by the AD Products is such that "the Army necessarily is using some alternative products providing some, if not all, of the functions performed by the Products." ECF No. 8 ¶ 72. Iron Bow also alleges that the Army acknowledged that "the use and need of those tools ha[d] not gone away." ECF No. 8-1 at 62. As the Court must accept these allegations at true at the dismissal stage, *United Pac. Ins. Co.*, 464 F.3d at 1327–28, the Court finds Iron Bow has adequately pled a breach of the non-substitution clause.[8]

2. <u>The Non-Substitution Clause Survived Expiration of the Delivery Order.</u>

The non-substitution clause did not expire with the Delivery Order because its plain language reflects that it was intended to survive for the full term. The Government argues that the non-substitution clause must be "read as only applying during the life of the delivery order to save

---

[8] At oral argument, the Government suggested that Iron Bow may not have adequately alleged damages arising from any breach of the non-substitution clause because Iron Bow's claimed damages—the contract value of the third and fourth option years—were instead a result of the Army's non-renewal decision. *See* ECF No. 16 at 50:22–51:12. This argument, however, was not raised in the Government's motion or reply brief. Generally, a party waives an argument by failing to raise it in its opening brief. *See, e.g.*, *Brooks Range Cont. Servs., Inc. v. United States*, 101 Fed. Cl. 699, 709 (2011). Even so, courts may exercise discretion to hear an argument that would otherwise be waived where the opposing party has been afforded a sufficient opportunity to respond. *Hardy v. United States*, 153 Fed. Cl. 624, 628 (2021). Here, the Government raised this argument for the first time at the conclusion of oral argument, at which point Iron Bow had no opportunity to respond. Accordingly, the Court need not address whether Iron Bow has sufficiently pled damages under Count III.

the entire contract from illegality." ECF No. 10 at 32. It is true that "where a contract is fairly open to two constructions, by one of which it would be lawful and the other unlawful, the former must be adopted." *Hobbs v. McLean*, 117 U.S. 567, 576 (1886); *see also Alvin, Ltd. v. U.S. Postal Serv.*, 816 F.2d 1562, 1564 (Fed. Cir. 1987) ("The parties are presumed to have entered into a valid and binding contract."). But the Government fails to engage with the text itself, offering no explanation for how the Court could fairly read the language of the non-substitution clause as applying only during the life of the Delivery Order. Additionally, as explained further below, the plain meaning of the non-substitution clause does not violate the ADA, the FAR, or CICA.

Generally, "an expired contract has by its own terms released all its parties from their respective contractual obligations, except obligations already fixed under the contract but as yet unsatisfied." *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 206 (1991). Individual provisions, however, "may survive a contract's expiration," if it is "contemplated by the terms of the contract." *Seven Resorts, Inc. v. United States*, 112 Fed. Cl. 745, 785 (2013). "A provision that survives the expiration of a contract's term, therefore, may obligate a party to perform under the provision even after the contract in which it is contained has expired." *Id.* (citing *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 555 (1964)); *see also Int'l Data Prods. Corp. v. United States*, 492 F.3d 1317, 1323 (Fed. Cir. 2007) (noting FAR 49.603-1(b)(7) "enumerates several rights and liabilities" of both the Government and the contractor that "survive termination" of the contract). In determining whether a provision survives termination or expiration of the contract, courts apply "normal principles of contract interpretation." *Litton*, 501 U.S. at 206.

The plain language of the non-substitution clause indicates that it was intended to survive expiration of the Delivery Order. Indeed, the clause could only be triggered "[i]n the event of any termination or expiration of this Contract prior to the end of the Term." ECF No. 8-1 at 29. In

other words, the non-substitution clause only takes effect upon the early termination or expiration of the Delivery Order. The Government's alternative interpretation would render the clause meaningless, as its triggering event (expiration of the Delivery Order) would make it inoperative. *Id.*; *see NVT Techs.*, 370 F.3d at 1159 (indicating a contract should be interpreted to "give reasonable meaning to all of its parts" and avoid rendering any portion "useless, inexplicable, void, or superfluous"). Further, the Delivery Order expressly stated an alternative date for the expiration of the non-substitution clause—the end of "the Term." ECF No. 8-1 at 29. It is clear, therefore, that the Delivery Order intended for the clause to operate for the remainder of the contract term if the Delivery Order terminated or expired prior to the completion of the fourth option year.

3. <u>The Non-Substitution Clause Does Not Implicate the ADA Because It Is a Negative Commitment.</u>

Contrary to the Government's argument, *see* ECF No. 10 at 29–30, the non-substitution clause does not violate the ADA because it is a negative commitment. The ADA prohibits a government official from involving the United States "in a contract or obligation *for the payment of money* before an appropriation is made." 31 U.S.C. § 1341(a)(1)(B) (emphasis added). An "obligation" is defined as either (a) "a definite commitment that creates a legal liability of the government for the payment of goods and services ordered or received," or (b) "a legal duty . . . that could mature into a legal liability by virtue of actions on the part of the other party beyond the control of the United States." *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 307–08 (2020) (quoting Gov't Accountability Off., *A Glossary of Terms Used in the Federal Budget Process* 70, GAO–05–734SP (2005)).

The Government appears to argue that the non-substitution clause fits within the definition of an "obligation" because Iron Bow's theory of liability contemplates that the parties entered into a "binding agreement for the future payment of money." ECF No. 12 at 18. The non-substitution

clause does no such thing. It is not a "contract or obligation for the payment of money," within the meaning of the ADA, because it is neither a definite commitment creating a legal liability to pay money, nor a legal duty that could mature into a legal liability by the actions of a third party. *See* 31 U.S.C. § 1341(a)(1)(B). By its terms, the non-substitution clause does not commit the Army to purchase goods or services. *See* ECF No. 8-1 at 29. Rather, the legal duty under the clause is negative (*i.e.*, not to purchase substitute products) and could only mature into a liability by virtue of Government action. *See id.*

Iron Bow aptly points out the similarity between the non-substitution clause and requirements contracts extending beyond the period of available appropriations. ECF No. 11 at 22. Such contracts do not violate the ADA or *Leiter* because a requirements contract imposes "no financial liability on the government until the government place[s] an order; the only obligation under the contract [is] a negative one—not to procure from someone else." *Funding of Maint. Cont. Extending Beyond Fiscal Year*, B-259274, 1996 WL 276377, at *4 (Comp. Gen. May 22, 1996). As the GAO explained, under a requirements contract, the agency has a choice once the current fiscal year's funds are exhausted: "either fund the remaining term of the contract with [the following fiscal year's] funds or do without the . . . services." *Id.* Thus, "a contractual obligation not to procure elsewhere" does not constitute an obligation for the payment of money under the ADA. *Id.*

Similarly, the non-substitution clause in the Delivery Order merely required that the Army not procure substitute products elsewhere during the full contract term. *See* ECF No. 8-1 at 29. The Government's argument that the non-substitution clause violates the ADA by "compel[ling] the mandatory exercise of option year renewals to avoid a breach regardless of whether there is a *bona fide* need during each option fiscal year periods," ECF No. 10 at 30, overstates the clause's

requirements. If the Government had no *bona fide* need for the Products during subsequent fiscal years, the non-substitution clause did not compel the Army to exercise the next option year under the Delivery Order. *See* ECF No. 8-1 at 29. Rather, the clause only prohibited the Army from ending the Delivery Order early and procuring substitutes elsewhere.[9] *Id.*

As another example of the principle that negative obligations do not implicate the ADA, Iron Bow cites *Lublin Corp. v. United States*, 98 Fed. Cl. 53 (2011). *See* ECF No. 11 at 22–23. In *Lublin*, the subcontractor-plaintiff alleged that the agency agreed to treat as confidential the plaintiff's responses to a programmatic review of the relevant prime contract. 98 Fed. Cl. at 54. The plaintiff further claimed that the agency breached this agreement by providing the plaintiff's responses to its prime contractor. *Id.* The Government insisted that the "thrust" of the plaintiff's complaint was that the agency "agreed to indemnify [the plaintiff] for any harm due to its participation in the [programmatic review]." *Id.* at 57. In the Government's view, such an "open-ended warranty or indemnification agreement[]" would violate the ADA. *Id.* (citing *Hercules*, 516 U.S. at 424–25). The court in *Lublin* rejected the Government's attempt to recast the plaintiff's alleged confidentiality agreement as one of indemnification on the basis "that the alleged agreement did not oblige [the agency] to pay plaintiff any funds, at least via performance." *Id.* at 58. It further explained that "[t]his is an important distinction" because the ADA is only implicated

[9] The alleged essentiality of the Products to the Army's use of AD services, ECF No. 8 ¶¶ 66–67, which the Court accepts as true at this early stage of the litigation, does not alter this conclusion. The Court is not aware of any instance where a requirements contract has been held to violate the ADA because of the essentiality of the products or services procured under the contract. To the contrary, the caselaw reveals instances where the Government has used requirements contracts to obtain essential goods and services. *See, e.g.*, *Ceredo Mortuary Chapel, Inc. v. United States*, 29 Fed. Cl. 346, 350–53 (1993) (upholding ambulance services contract as an enforceable requirements contract rather than an unenforceable indefinite quantity agreement). In any event, as explained, if the Army no longer had a *bona fide* need for the Products, the non-substitution clause would not require the Army to continue purchasing them.

in "situations in which ***performance*** of a contract would commit the United States or agency thereof to pay funds." *Id.* (emphasis in original). Conversely, "no case suggests that the ADA prevents an otherwise authorized official from entering into a contract because the ***breach*** of that contract would require the United States to pay damages." *Id.* (emphasis in original).

This principle is further reinforced by the Availability of Funds clause, FAR 52.232-19, incorporated into the Delivery Order, which stated that "[n]o legal liability on the part of the Government for any payment may arise *for performance under this contract* beyond 02 May 2022, until funds are made available." ECF No. 8-1 at 22 (italicization added, red text in original). FAR 52.232-19 similarly distinguishes between payment for *performance* of a contract and payment for *breach* of a contract. The former constitutes an "obligation" under the ADA while the latter does not. Consistent with this distinction, the non-substitution clause does not implicate the ADA because it imposed only a negative commitment on the Army not to procure substitute products.

The Government's citation to the language in 31 U.S.C. § 1501 as indicating that an obligation also includes a binding agreement "executed before the end of the period of availability for obligation of the appropriation[,]" *id.* § 1501(a)(1)(B), or "other legal liability of the Government against an available appropriation or fund," *id.* § 1501(a)(9), does not lead the Court to a different result. *See* ECF No. 12 at 17–18. Instead, when viewed in context, this statutory provision, which defines when "[a]n amount shall be recorded as an obligation of the United States," is similarly limited to a definite commitment for the future payment of money or a legal duty that could mature into a legal liability by the actions of a third party. 31 U.S.C. § 1501(a). For instance, § 1501(a)(1) refers to "a binding agreement . . . executed before the end of the period of availability for obligation of the appropriation or fund used *for specific goods to be delivered, real property to be bought or leased, or work or service to be provided*." *Id.* § 1501(a)(1)(B)

(emphasis added). Thus, this subsection specifically refers to instances where a government agency enters into a binding agreement "that creates a legal liability of the government for the payment of goods and services ordered or received." *Me. Cmty. Health Options*, 590 U.S. at 307. Likewise, § 1501(a)(9) focuses on an "other legal liability of the Government," *id.*, which would include "a legal duty . . . that could mature into a legal liability by virtue of actions on the part of [] other part[ies] beyond the control of the United States," *Me. Cmty. Health Options*, 590 U.S. at 307–08, but not, as here, a legal duty of the Government that could only mature into a legal liability by virtue of Government action. Accordingly, the Government has not established that 31 U.S.C. § 1501 provides any alternative or broader definition of an "obligation" for purposes of the ADA than that discussed by the Supreme Court and GAO. *See Me. Cmty. Health Options*, 590 U.S. at 307–08. Even under the Government's cited statute, the non-substitution clause is not an obligation because it is not a definite commitment that creates a legal liability for the payment of goods and services, nor a legal duty that could mature into a legal liability through actions of a party beyond the control of the United States.

4. <u>FAR 17.207 Was Not a "FAR term" of the Delivery Order and Does Not Conflict with the Non-Substitution Clause.</u>

The Government additionally argues that the non-substitution clause violates FAR 17.207. ECF No. 10 at 30–31. The Court disagrees. FAR 17.207 directs contracting officers to determine, prior to exercising an option, that the "exercise of the option is the most advantageous method of fulfilling the Government's need," considering "price and other factors." FAR 17.207(c)(3). In the Government's view, the non-substitution clause "would prevent the Government from pursuing more cost-effective ways of fulfilling the Government's requirements," and thus "render FAR 17.207(c) a nullity." ECF No. 10 at 31. The Government asserts that FAR 17.207(c) must prevail over the non-substitution clause because Iron Bow's payment terms provided that "[i]f any

of these payment terms conflict[] with any other provision of this contract or any other document, the FAR terms prevail." ECF No. 8-1 at 29. But FAR 17.207 was not incorporated into and thus was not a "FAR term" of the Delivery Order.

Even to the extent that FAR 17.207 applies as a mandatory FAR requirement, *see DynCorp Info. Sys., LLC v. United States*, 58 Fed. Cl. 446, 451 (2003) (explaining that FAR regulations "have the force and effect of law" (citing *Newport News Shipbuilding & Dry Dock Co. v. Garrett*, 6 F.3d 1547, 1552 (Fed. Cir. 1993)), the non-substitution clause does not conflict with it. While FAR 17.207 requires the contracting officer to consider market prices, among other factors, in determining whether exercise of an option is the most advantageous method of fulfilling the Government's needs, the Army's contractual commitment under the non-substitution clause does not obligate it to exercise options under the Delivery Order. *See* ECF No. 8-1 at 29. Thus, the contracting officer retains discretion in determining whether the exercise of an option is the most advantageous method of fulfilling the Government's needs, and FAR 17.207 provides no basis for rendering the non-substitution clause unenforceable.

5. <u>The Non-Substitution Clause Does Not Violate CICA's Full-and-Open Competition Requirement Because Iron Bow Alleges that the Options Were Evaluated at the Time of the Initial Competition.</u>

The non-substitution clause similarly does not run afoul of CICA. The Government argues that the non-substitution clause "violates the basic premise of [CICA] that Government procurements use competitive procedures" because "there could be no competition whatsoever for the requirements filled by the delivery order for five years after the issuance of the delivery order." ECF No. 10 at 32 (citing 10 U.S.C. § 3201; 41 U.S.C. § 3301; and FAR 6.101). CICA generally requires that, absent an exception, agencies use "full and open competition" when conducting a procurement. *See Nat'l Gov't Servs., Inc. v. United States*, 923 F.3d 977, 982 (Fed. Cir. 2019)

(discussing 41 U.S.C. § 3301(a)(1)). The non-substitution clause does not implicate CICA's full-and-open competition requirement because such statutory requirement does not apply to the exercise of options provided that certain conditions are met, which Iron Bow alleges is the case here.

Specifically, CICA's full-and-open competition requirement does not apply to the exercise of options where the agency evaluates the options as part of the original award, and the options are "exercisable at an amount specified in or reasonably determinable from" the contract. FAR 17.207(f); *see also* FAR 6.001(c) (excepting "the exercise of priced options that were evaluated as part of the original competition" from the scope of FAR Part 6 – Competition Requirements); *cf. Magnum Opus Techs., Inc. v. United States*, 94 Fed. Cl. 512, 540 (2010) (finding that the agency failed to comply with FAR 17.207(f) because "[t]he pricing of the options, as exercised, was not 'evaluated as part of the initial competition'"). Iron Bow alleges that the Army evaluated the base period and all four option periods when awarding the Delivery Order. ECF No. 8 ¶ 21. In resolving the Government's motion, the Court must accept that allegation as true. *United Pac. Ins. Co.*, 464 F.3d at 1327–28. Moreover, the Delivery Order specified that each of the four option years was exercisable at a price of $12,484,900, ECF No. 8 ¶ 22; ECF No. 8-1 at 19–20, thus satisfying the requirement that the amount of the options be "specified . . . or reasonably determinable," FAR 17.207(f), or "priced," FAR 6.001(c). Therefore, based on the facts pled, the non-substitution clause does not violate CICA's full-and-open competition requirement, as the requirement was satisfied at the time of initial award.

* * *

Iron Bow has sufficiently alleged that the Government breached the non-substitution clause because it replaced the Products with alternatives during the third and fourth option years despite

a contractual commitment not to do so. The plain language of the Delivery Order contemplated that the non-substitution clause would survive termination or expiration of the Delivery Order, and such an interpretation does not violate either the ADA, the FAR, or CICA. Accordingly, the Court denies the Government's Motion to Dismiss as to Count II.

**D. Iron Bow Has Adequately Pled a Breach of the Implied Duty of Good Faith and Fair Dealing.**

Finally, Iron Bow's claim for breach of the covenant of good faith and fair dealing survives dismissal. Iron Bow alleges that the Army's failure to exercise all options under the Delivery Order destroyed Iron Bow's reasonable expectation that the Agency would do so. ECF No. 8 ¶¶ 83–84. In Iron Bow's view, this expectation arose from the Army's: (1) "contractual obligation to exercise all options unless certain circumstances arose that are not present here," (2) "representation that the Products would be essential for all possible periods of performance," and (3) representation that it "would not use other products performing any of the functions performed by the Products." *Id.* ¶ 83. The Court rejects the Government's arguments that this claim is redundant of Iron Bow's material misrepresentation allegation and rests on an unreasonable expectation. *See* ECF No. 10 at 33–36; ECF No. 12 at 23–24. The Court further concludes that Iron Bow's good faith claim meets the pleading standard.

1. <u>At the Pleadings Stage, Iron Bow Adequately Distinguishes Its Claim for Breach of the Covenant of Good Faith and Fair Dealing from Its Material Misrepresentation Claim.</u>

Contrary to the Government's argument, ECF No. 12 at 23–24, Iron Bow's claim for breach of the implied duty of good faith and fair dealing is not redundant of its misrepresentation claim. Generally, a claim for breach of the covenant of good faith and fair dealing is "redundant 'when a breach of contract claim, based upon the same facts, is also pled.'" *BGT Holdings LLC v. United States*, 984 F.3d 1003, 1016 (Fed. Cir. 2020) (quoting *Cruz v. FXDirectDealer, LLC*,

720 F.3d 115, 125 (2d Cir. 2013)). This is because a plaintiff need not "invoke the doctrine of good faith and fair dealing" where "the contract itself provides other avenues of relief." *Id.* But so long as the plaintiff has identified "additional facts" that "its good faith and fair dealing claim relies upon," the Court should not dismiss it as redundant at this stage. *ASI Constructors, Inc. v. United States*, 129 Fed. Cl. 707, 721 (2016).

As an initial matter, the Government waived its redundancy argument by failing to raise it in its opening brief. *See DDR Holdings, LLC v. Priceline.com LLC*, 122 F.4th 911, 918 (Fed. Cir. 2024) (noting that it "is well established that arguments not raised in the opening brief are [forfeited]" (alteration in original) (quoting *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006))); *Brooks Range Cont. Servs., Inc. v. United States*, 101 Fed. Cl. 699, 709 (2011) (finding litigant "waived its right to assert" an argument "[b]y failing to raise the issue in its opening brief").

In any event, Iron Bow's claim under the implied duty of good faith and fair dealing is not redundant because it relies on additional facts from those underlying Iron Bow's material misrepresentation claim. *BGT Holdings LLC*, 984 F.3d at 1016. Iron Bow persuasively explained these additional facts at oral argument. *See* ECF No. 16 at 39:12–40:8. That is, Iron Bow's material misrepresentation claim "focuses on what the Government knew at the time of contracting" and whether, based on that knowledge, its representations in the Delivery Order were false. *Id.* at 40:6–8. Conversely, Iron Bow's good faith claim turns on the Agency's decision "declining to exercise the option despite available funds and continued need," which allegedly "defeat[ed] the value of [Iron Bow's] bargain" under the Delivery Order. *Id*. at 39:24–40:5. Thus, the two claims are not redundant because Iron Bow has identified additional facts upon which its good faith claim relies. *ASI Constructors*, 129 Fed. Cl. at 721.

2. Iron Bow's Expectation that the Army Would Exercise All Options Was Not Unreasonable as a Matter of Law.

Whether Iron Bow's expectations under the Delivery Order were reasonable is a factual dispute not suitable for resolution under RCFC 12(b)(6). The covenant of good faith and fair dealing only protects the parties' reasonable or justified expectations. *See Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005) (citing Restatement (Second) of Contracts § 205 cmt. a (1981)). A party's "'justified expectations' are those that objectively flow directly from the terms of the contract and 'must attach to a specific substantive obligation, mutually assented to by the parties.'" *Helix Elec., Inc. v. United States*, 68 Fed. Cl. 571, 587 (2005) (quoting *State of Alaska v. United States*, 35 Fed. Cl. 685, 704 (1996), *aff'd*, 119 F.3d 16 (Fed. Cir. 1997), *cert. denied*, 522 U.S. 1108 (1998)). Generally, whether a party's expectations were reasonable is a fact-intensive inquiry that cannot be resolved at the dismissal stage. *See, e.g.*, *Hamilton Square, LLC v. United States*, 160 Fed. Cl. 617, 629 (2022) (denying motion to dismiss the plaintiff's claim for breach of the implied duty of good faith and fair dealing because "[w]hether [the plaintiff's] expectations and the [agency's] conduct, in the context of the [written agreement], were reasonable is a fact-intensive inquiry"). The Court may not, therefore, dismiss Iron Bow's claim for breach of the covenant of good faith and fair dealing unless the Government demonstrates Iron Bow's expectations were unjustified as a matter of law.

The Government has not shown that Iron Bow's expectation that the Army would exercise all option periods under the Delivery Order was unreasonable as a matter of law. To be sure, Iron Bow's expectation could be legally unjustified if it solely relied on the option-renewal term, as that term did not and could not contractually require the Government to exercise all options under the Delivery Order, *see supra* § III.A. Iron Bow's expectation, however, did not solely rely on that term. Rather, it also derived from "the Army's representation that the Products would be

essential for all possible periods of performance, and that the Army would not use other products performing any of the functions performed by the Products."[10] ECF No. 8 ¶ 83. Because Iron Bow's expectation was based on three different statements that the Agency made in the Delivery Order, the Government cannot establish that Iron Bow's expectation was unreasonable as a matter of law because one of the contractual bases for this expectation was legally untenable. To the extent that Iron Bow's expectation was based on promises or representations in the Delivery Order that (a) Iron Bow reasonably interpreted and (b) were not contrary to law, such as the representation of essentiality and non-substitution clause, whether Iron Bow's expectation was reasonable is a fact issue not suitable for resolution at this stage. *See Hamilton Square*, 160 Fed. Cl. at 629. Therefore, the Government has not demonstrated that Iron Bow cannot as a matter of law recover under its breach of the implied duty of good faith and fair dealing claim.

3. Iron Bow's Claim for Breach of the Implied Duty of Good Faith and Fair Dealing Meets the Pleading Standard.

For similar reasons, Iron Bow has met the pleading standard for its allegation that the Army breached the covenant of good faith and fair dealing. Such a claim requires a plausible allegation that "a party . . . interfere[d] with another party's rights under the contract." *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 828 (Fed. Cir. 2010). The specific allegation may "depend on the contract's allocation of benefits and risks." *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2014). However, a claim for breach of the implied duty generally

[10] As explained, the Army's representation regarding the expected essentiality of the Products did not contractually guarantee that the Agency would exercise all option years. *See supra* § III.B.1. That does not, however, preclude as a matter of law the possibility that Iron Bow reasonably relied on this representation, in conjunction with the Army's other representations, in forming its expectation. *See Merlin*, CBCA No. 1012, 11-2 BCA ¶ 34,689 at 171,515–16 (distinguishing between a guarantee of continued renewal and an indication of the agency's expectations at the time of contract).

consists of an allegation that a party breached either: (a) a "duty not to interfere with the other party's performance," or (b) an obligation "not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Centex*, 395 F.3d at 1304; *see also Dotcom Assocs. I, LLC v. United States*, 112 Fed. Cl. 594, 596 (2013) (explaining that "[t]o state a claim for breach of the implied covenant of good faith and fair dealing . . . a party generally must allege some kind of 'subterfuge[]' or 'evasion[],' such as 'evasion of the spirit of the bargain'" (quoting Restatement (Second) of Contracts § 205 (1981))).

Iron Bow has adequately pled its claim that the Army breached its obligation not to destroy Iron Bow's reasonable expectations regarding the fruits of the Delivery Order. *See Centex*, 395 F.3d at 1304. Specifically, Iron Bow plausibly alleges that it "reasonably expected that the Army would exercise all options" and that "[t]he Army deprived Iron Bow of its reasonable expectations under the Contract when it declined to exercise the option periods . . . and used other products performing functions that the Products perform." ECF No. 8 ¶¶ 83–84. Thus, Iron Bow has met the pleading standard by plausibly alleging factual allegations supporting its claim that the Army breached its obligation not to interfere with Iron Bow's reasonable expectations under the Delivery Order. As a result, the Government's Motion to Dismiss as to Count IV is denied.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the Government's Motion to Dismiss under RCFC 12(b)(6) for failure to state a claim (ECF No. 10).

Counts I and III of Iron Bow's First Amended Complaint (ECF No. 8) are **DISMISSED**. Conversely, Counts II and IV survive dismissal.

**SO ORDERED.**

Dated: July 29, 2026

*/s/ Kathryn C. Davis*
KATHRYN C. DAVIS
Judge